### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Jose Guzman, Jaime Mercado, Bernardo Mercado, Crisanto Pichardo and Celestino Mercado, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 10 CV 01499 |
| v. | ) ) | Judge John Robert Blakey |
| Laredo Systems, Inc., Laredo Systems, LLC, and Enrique Jaime, | ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Jose Guzman, Jaime Mercado, Bernardo Mercado, Crisanto Pichardo, and Celestino Mercado sued their former employer, Laredo Systems, Inc., and its owner, Enrique Jaime, Sr., for violations of the Fair Labor Standards Act, the Illinois Minimum Wage Law, and the Illinois Prevailing Wage Act. After summary judgment proceedings resolved the question of liability, and after Defendant Jaime emerged from bankruptcy, the Court conducted a bench trial on June 28 and 29, 2021 to address damages. In accordance with Federal Rule of Civil Procedure 52(a), this Memorandum Opinion and Order reflects the Court's Findings of Fact and Conclusions of Law on the relevant issues of the case.

## I.   Background & Procedural History

Defendant Laredo Systems, Inc. (known as Laredo Systems, LLC at least by October of 2012) operates as a landscaping business in Garden Prairie, Illinois. Defendant Enrique Jamie serves as Laredo's president and runs the company.

During the relevant time, most of Laredo's work consisted of subcontractor work on public works projects along expressways and tollways in the Chicago area.

Plaintiffs Jose Guzman, Jaime Mercado, Bernardo Mercado, Crisanto Pichardo, and Celestino Mercado worked as landscapers for Laredo. Defendants paid Plaintiffs Jose Guzman, Celestino Mercado, Bernardo Mercado, and Crisanto Pichardo a flat rate of $80.00 per workday and paid Plaintiff Jaime Mercado a higher rate of $120.00 per workday.[1]

On March 5, 2010, Plaintiffs sued Laredo and Enrique Jaime, claiming that their flat rates of pay failed to cover overtime compensation, in violation of the Fair Labor Standards Act (Count I); failed to compensate Plaintiffs for all hours worked, in violation of the Illinois Minimum Wage Law (Count II); and fell short of the "prevailing wage" for work Plaintiffs performed on public works projects, in violation of the Illinois Prevailing Wage Act (Count III).

Plaintiffs moved for summary judgment on the issue of liability, and then-presiding Judge Manning granted summary judgment in Plaintiffs' favor and against Defendants on all three counts. *See* [111]. Judge Manning determined that Plaintiffs established that Defendants required them to report to Laredo's headquarters in Garden Prairie by 6:30 a.m. each workday, where Enrique Jaime assigned their worksites for the day. Plaintiffs would gather their tools and equipment from the

---

[1] Laredo paid Jaime Mercado a higher rate because he drove the other employees to Laredo's shop and to the worksites. The actual amount paid to Mercado, however, vacillates in the record. Based upon the record before her on summary judgment, Judge Manning found that Laredo paid Mercado $130 per day, and this remains consistent with the parties' prior representations, here; in fact, in their proposed pretrial order, the parties stipulated that Laredo paid Mercado $130 per day, [266] at 8, ¶ 45. At trial, however, the parties stipulated that Laredo paid Mercado $120 per day, and so the Court finds, for purposes of calculating damages, that Mercado's flat daily rate was $120.

shop, then be transported to those worksites. At the end of the workday, they would travel back to Laredo's shop before going home. Plaintiffs argued that Defendants should have paid them for the entire workday, including travel time, while Defendants countered that Plaintiffs were entitled to pay only for the (approximately) six hours they spent on the worksites each day. Judge Manning sided with Plaintiffs, finding that, because Plaintiffs received their assignments at the shop and gathered their tools there before being transported to the worksites, federal law required Defendants to pay them for the time they spent traveling to and from those sites. Judge Manning thus determined that Plaintiffs effectively worked 11- or 12-hour days, and accordingly that the $80.00 flat daily rate fell below the applicable federal and state minimum wages, as well as the "prevailing wage" established for public works projects under the Illinois Prevailing Wage Act. She found that Jaime Mercado's $130 flat daily rate violated the FLSA and the Illinois Prevailing Wage Act but satisfied the Illinois Minimum Wage Act. She thus entered judgment in favor of all Plaintiffs on their FLSA and Prevailing Wage Act claims and in favor of all Plaintiffs except Jaime Mercado on their IMWL claim.

In addition, Judge Manning determined that Defendant Enrique Jamie's admission that he was president and in charge of Laredo Systems made him an "employer" under the FLSA, subjecting him to personal liability. [111] at 1 n.1. Judge Manning did not address damages, as Plaintiffs sought judgment on liability alone.

After Judge Manning granted summary judgment to Plaintiffs on the issue of liability, she sent the parties to the assigned Magistrate Judge for a settlement

conference.[2] Before the conference could take place, however, Defendants advised that they had no interest in participating, and so the Magistrate Judge returned the case to the District Judge. *See* [127].

Meanwhile, in December of 2012, Judge Manning took inactive status, and the case was reassigned to Judge Shadur, who, on February 14, 2013, entered an order on Plaintiff's interim petition for fees and costs, [130], awarding Plaintiffs $167,862.50 in fees and $11,890.52 in nontaxable expenses, [131]. Judge Shadur then set the matter for trial in November 2014. *See* [147]. But three days before the trial, Defendant Enrique Jaime filed for bankruptcy, automatically staying the case. Despite the stay, when issues arose about the legitimacy of Enrique Jaime's businesses, Judge Shadur issued an order January 18, 2017, finding that Jaime was "fully responsible" for the full amount of the interim award of fees and costs. [195].

When Judge Shadur retired on August 28, 2017, the case was reassigned to Judge St. Eve, *see* [204], who continued the stay pending Jaime's bankruptcy. The case was reassigned yet again to this Court when Judge St. Eve was elevated to the Court of Appeals, *see* [216].

After the automatic bankruptcy stay was lifted on July 30, 2018, this Court recruited counsel for Defendants, *see* [231], and set the case for trial. After resetting the matter numerous times at the parties' request and because of the COVID-19 public health crisis, the Court conducted a bench trial on damages on June 28 and 29, 2021.

---

[2] The parties had attempted to settle this matter once before, on March 15, 2012, but they were unsuccessful. *See* [86].

## II.  **Trial**

At trial, Plaintiffs presented evidence to buttress Judge Manning's ruling on liability and to prove the amount of their damages.  Plaintiff Jaime Mercado testified that he worked as a landscaper for Laredo from August 2005 until December of 2009 and that he also served as a driver.  [274] at 16–17.  Jamie Mercado testified that Laredo paid him a flat daily rate of $100 in 2005 and the first part of 2006; $110 from May 2006 to 2007; and $120 from early 2007 through December of 2009.  *Id.* at 24.  Jaime Mercado testified that he arrived at Laredo's shop each day by 6:00 a.m. and returned to the shop at 6:00 or 7:00 p.m., except on Saturdays, when he returned to the shop by 4:00 p.m.  *Id.* at 17, 19.  Mercado testified that he did not receive any type of overtime compensation for working more than eight hours in a workday or working more than 40 hours in a workweek, *id.* at 25; he also testified that, on days when he could not work because of rain, Laredo did not pay him, *id.* at 20.

Plaintiff Bernardo Mercado testified that he worked for Laredo for just one season,[3] from March of 2008 to December of 2008; he testified that he worked five or six days a week from about 6:00 a.m. to about 6:00 or 7:00 p.m.  *Id.* at 51–52, 54.  When asked how many hours he worked each workday, Bernardo Mercado said, "between 11 and 12."  *Id.* at 57.  He could not recall how many Saturdays he worked, but he testified that, when he worked on Saturdays, he worked until just 4:00 p.m.  *Id.* at 54.  He also testified that he worked one Sunday at Laredo, and also worked at Enrique Jaime's personal residence (referred to as the "farm") on two occasions.  *Id.*

---

[3] Based upon the record, the term "season" refers to the time of year, sandwiched by spring and early winter, when outdoor landscaping work is necessary and feasible in Illinois.

at 55. Bernardo Mercado testified that Laredo paid him once a week at a flat rate of $80 per day; he did not receive overtime. *Id.* at 57–58.

Plaintiff Celestino Mercado testified that he worked for Laredo during the 2008 and 2009 seasons, from roughly March to December each year; he worked five to six days a week, arriving at 6:00 a.m. and leaving for the day between 6:00 and 7:00 p.m. [274] at 72–73, 75. He testified that, when he worked Saturdays, he finished work around 3:00 or 4:00 p.m. *Id.* at 75. He testified that he worked a Sunday "every once in a while." [275] at 14. He testified that he also worked at Enrique Jaime's farm on three or four occasions. [274] at 76. Celestino Mercado testified that Laredo paid him once a week at a flat rate of $80 per day; he did not receive overtime. *Id.* at 78.

Plaintiff Jose Guzman testified (via deposition testimony jointly designated by the parties and admitted by agreement at trial, [275] at 103), that he worked for Laredo from September 2007 to December 2007 and again during the 2008 and 2009 seasons, through December 16, 2009. Guzman Dep., pp. 7–8, 17. Guzman testified that he made $80 a day, *id.* at 10. He testified that he also worked at Enrique Jaime's farm for three days in the 2007 season, for five to six weeks in the 2008 season, and for about one week in the 2009 season. *Id.* at 15. Guzman testified that he worked seven days "maybe one time at most," *id.* at 22; the other weeks, he worked five or six days. *Id.* He testified that he started work at 6:00 a.m. and would leave work "around 6:00, 6:30, 7:00, sometimes later than that." *Id.* Guzman testified that he did not receive overtime pay. *Id.* at 18.

Crisanto Pichardo testified (via deposition testimony jointly designated by the parties and admitted by agreement at trial, [275] at 103) that he worked as a landscaper for Laredo beginning April 27, 2005, and worked the 2005, 2007, and 2008 seasons (he did not work during 2006 because of a family situation). Pichardo Dep., pp. 13, 17, 15. Pichardo testified that he made $80 a day and generally worked six days a week from April to November, beginning around 6:00 a.m. each day. *Id.* at 14, 17. Pichardo also testified that he sometimes worked at Enrique Jaime's farm, *id.* at 23; in 2007 he worked there "sometimes two days a week, sometimes not all the time," *id.* at 26; in 2009 he worked there sometimes but "most of the time" he worked "by Glenview, 294." *Id.* He did not work on the farm in 2008. *Id.*

Enrique Jaime, Jr. also testified (via deposition testimony jointly designated by the parties and admitted by agreement at trial, [275] at 103). Jamie, Jr., who is not a plaintiff but is Defendant Jaime's son, testified that he worked alongside Plaintiffs during the 2005 to 2009 time period. Jaime, Jr. Dep., p. 9. Jaime, Jr.'s testimony confirms what Plaintiffs said: that employees would report to Laredo "anywhere between 6:00 to 7:00 a.m., depending on what time of year it was" and what time the sun came up; that the jobs would end about 4:30 p.m.; and that employees would be back at Laredo an hour or two later. *Id.* at 10–11, 15. Jaime, Jr. similarly testified that he did not receive overtime for any hours in excess of 40, *id.* at 41, but he also testified that he was paid "a salary" of $125 or $130 a day. *Id.* at 22, 40.

7

Finally, Plaintiffs called Defendant Enrique Jaime.  Jamie testified that most of Laredo's work was prevailing wage work, and that Laredo received its landscaping work through bidding on the landscaping portion of such jobs.  [275] at 45.  Enrique Jaime testified that he required his employees to come to the Laredo shop before work to collect tools and equipment, and he required them to leave the shop by 7:00 a.m. to get to the worksites.  *Id.* at 45–46.  He testified that he generally decided which employees would work on which crew and which worksite.  *Id.* at 44–45.  He testified that Laredo employees did not punch a time clock but were paid based upon a "daily salary that we agreed on."  *Id.* at 47.  He testified that all Plaintiffs were paid $80 a day, except Jaime Mercado, who received a higher rate because he was a driver and would drive employees to the worksites, sometimes as far as 70 or 80 miles away, and then back to the shop, usually by about 5:30 p.m.  *Id.* at 47–48.  Jaime testified that if his employees did not work, they did not get paid, and if they worked a half-day, they received a half-day's pay.  *Id.* at 50.

Defendant Jaime admitted that he was aware that Illinois had a minimum wage law, that the law required him to pay overtime for hours worked in excess of 40 hours in a workweek, and that prevailing wage jobs for governmental work required the payment of prevailing wages to workers on those jobs.  *Id.* at 49–50, 53.  Jaime testified that, for the majority of "state jobs," he was required as a subcontractor to submit certified payrolls to the general contractor.  *Id.* at 50.  And he testified that, when he prepared such records, rather than using exact hours information, he used an estimate of six hours per day, based upon his experience of what the day looked

like for the landscapers he hired. *Id.* at 52. Jaime also testified that none of the Plaintiffs belonged to the union, *id.* at 22; he testified that he did not pay prevailing wages, did not pay anything for employees' health insurance, did not contribute toward employee pensions, and did not provide vacation or paid time off, *id.* at 54. In his view, he did not believe he was required to do so. *Id.* at 56.

With regard to the paychecks Laredo issued to Plaintiffs, Enrique Jaime testified that those records accurately reflect the time periods during which Laredo employed each Plaintiff. *Id.* at 62. He also testified that, for payroll purposes each week, he kept track of who worked what days and at which worksites, but he threw those records out after the paychecks were cut for that week. *Id.* at 63–64. Jaime testified that he did not pay Plaintiffs at the prevailing wage rates because they agreed to work for a daily salary; he also indicated that if he had bid for jobs based upon prevailing wage rates, Laredo would never have been awarded contracts and neither he nor Plaintiffs would have been able to work. *Id.* at 66–67. He testified that other landscapers similarly fail to pay prevailing wages for such projects. *Id.* at 119. Jaime testified that Laredo worked on approximately five State of Illinois/Toll Authority jobs per year. *Id.* at 116–17.

In addition to the testimony, the parties stipulated to various facts. *See* [266] at 6–11; [275] at 42 (admitting stipulation 98 into evidence), 100 (admitting stipulations 1 through 95, 97, and 99 into evidence). They stipulated that Plaintiffs were required to arrive for work at Laredo's Garden Prairie facility by 6:30 a.m. and arrive back to Garden Prairie around 5:30 p.m. Factual Stipulation 22; [266] at 6, ¶

9

25.[4]  They stipulated that Plaintiffs could travel as far as 70 to 80 miles to their worksites and would work at those sites until around 4:30 p.m. before driving back to Laredo's shop.  Factual Stipulations 29, 32; [266] at 7.  ¶¶ 32, 35.  The parties stipulated that Plaintiff Jose Guzman worked for Laredo from September of 2007 until the end of the 2009 season; that Plaintiff Celestine Mercado worked for Laredo from March of 2008 until the end of the 2009 season; that Plaintiff Jaime Mercado worked for Laredo from November of 2005 until the end of the 2009 season; that Plaintiff Bernardo Mercado worked for Laredo from March of 2008 to December 2008; and that Plaintiff Crisanto Pichardo worked for Laredo during the 2005, 2007, 2008, and 2009 seasons.  Factual Stipulations 17–21; [266] at 6, ¶¶ 20–24.  They stipulated that, throughout the relevant time period, Laredo paid Bernardo Mercado, Celestino Mercado, Crisanto Pichardo, and Jose Guzman $80 per day and paid Jaime Mercado $120 per day.  Factual Stipulations 40–42; [266] at 8, ¶¶ 44–45.

The parties stipulated that at all times relevant, Defendant Enrique Jaime was the sole owner of the sole proprietorship Laredo Systems.  Factual Stipulation 98.  And they stipulated to the minimum wage rates in Illinois during the relevant time period.  Finally, they stipulated to the various prevailing wage rates that applied in the Chicagoland area during the relevant time period, but they did not offer any

---

[4] Because this was a bench trial, counsel did not read the stipulations into the record, but simply moved for the joint admission of a signed copy of the parties' stipulations. [275] at 100.  The signed version admitted at trial is similar, but not identical to the stipulations submitted with the parties' proposed pretrial order [266], which appears on the record.  Where the stipulations are substantively the same, the Court thus references both the stipulations admitted at trial and the full versions included in the parties' proposed pretrial order, [266].

10

stipulation about what specific prevailing wage rate applies to what specific jobs or hours.

## III.  Discussion & Analysis

### A.  Factual Findings[5]

Based upon the evidence at trial, including the parties' stipulations and the Court's own observations of the testimony and credibility assessments, this Court makes the following findings of fact:

- Plaintiff Jose Guzman worked for Defendants, on a seasonal basis, from September of 2007 until the end of the 2009 season, earning a flat daily rate of $80;

- Plaintiff Celestine Mercado worked for Defendants during the 2008 and 2009 seasons, earning a flat daily rate of $80;

- Plaintiff Jaime Mercado worked for Defendants, on a seasonal basis, from August of 2005 until the end of the 2009 season, earning a flat daily rate of $120;[6]

- Plaintiff Bernardo Mercado worked for Defendants, on a seasonal basis, from March of 2008 to December 2008, earning a flat daily rate of $80; and

- Plaintiff Crisanto Pichardo worked for Defendants during the 2005, 2007, 2008, and 2009 seasons, earning a flat daily rate of $80.

Additionally, the Court finds that, as a general rule, Plaintiffs worked 11 hours each day, arriving to Laredo Systems' headquarters in Garden Prairie by approximately 6:30 a.m. and returning between 5:30 and 7:00 p.m. At headquarters, Plaintiffs received their work assignments, gathered their tools and equipment,

---

[5] As needed, this Court also makes additional factual findings in its substantive discussion of Plaintiffs' claims, below. *See infra* §§ III(B), (C).

[6] Jaime Mercado testified that he received a lower daily rate in the years before 2007, [274] at 24. But, in light of the statute of limitations (discussed below), those lower rates remain irrelevant to any damages calculation.

loading it into company vehicles, and then drove to their assigned worksites, often traveling as far as 70–80 miles and as much as an hour or two to get from Laredo headquarters to the various worksites.  Once at their worksites, Plaintiffs performed landscaping work until about 4:30 p.m., taking one half-hour lunch break each day. At the end of the workday, Plaintiffs packed up their tools, equipment, and trash/clippings, and drove back to Laredo's headquarters in Garden Prairie, where they would unload their trucks before leaving for home, typically between 5:30 and 7:00 p.m.  Weather permitting, Plaintiffs worked 5 to 6 days per week on this schedule, except on Saturdays, when they returned to Laredo's headquarters by 3:30 or 4:00 p.m.

Enrique Jaime kept track of the number of days each Plaintiff worked each week.  And, in calculating Plaintiffs' pay each week, Jaime simply multiplied the number of days that each employee worked during the pay period by the particular employee's daily rate.  When the weather precluded landscaping work, Plaintiffs did not work and did not get paid.  On days when the weather turned south after Plaintiffs were on the job, they typically worked a half day and received a half-day's pay equal to half their daily rate.

Defendants did not pay Plaintiffs for travel or overtime; nor did Defendants pay Plaintiffs enhanced wages for working Saturdays, Sundays, and holidays. Defendants did not provide health insurance or benefits to Plaintiffs. Defendants did not withhold federal or state income taxes from Plaintiffs' paychecks; nor did

Defendants withhold Social Security or Medicare contributions. Plaintiffs received no W-2 Forms or 1099 Forms from Laredo.

Plaintiffs did not punch a time clock, and Defendants did not keep exact records of the hours each employee worked each day or week; nor did Defendants track any overtime. Defendants did track the number of days each Plaintiff worked, and paid Plaintiffs for each day using the agreed-upon flat daily rates. The only documents Defendants retained were the paychecks Laredo issued to Plaintiffs. Similarly, the only documents Plaintiffs received from Laredo were their paychecks, which (using simple division by the applicable daily rate) accurately reflect the number of days (though not the number of hours) each Plaintiff worked each week. The Court finds that Plaintiffs' Group Exhibits 5, 6, 7, 8, and 9 accurately reflect the hours worked by each Plaintiff.

For the most part, Plaintiffs worked on landscaping jobs near the highways in northern Illinois. In total, about 10% of Plaintiffs' work was performed at Enrique Jaime's farm in Durand, Illinois. Jamie Mercado, Bernardo Mercado, and Celestino Mercado each worked at Jaime's farm for less than a handful of days during their employment with Laredo: Jaime Mercado worked there four days in his five years of employment; Bernardo worked there twice; and Celestino worked there three or four days in over four years of employment. Plaintiffs Crisanto Pichardo and Jose Guzman worked at the farm more often: in 2007, Crisanto Pichardo sometimes worked two days a week, nine hours a day, at the farm; and Jose Guzman worked at

the farm for three days in 2007, for five to six weeks in 2008, and for about a week in 2009. None of the work at the farm was prevailing wage work.

The other 90% of Plaintiffs' work occurred in and around highways, and most of this highway work was performed in connection with public works projects falling within the Illinois Prevailing Wage Act. *See* Factual Stipulation 7 (about 5% of Laredo's work was for the Illinois Department of Transportation). For those jobs, Laredo would have been hired as a subcontractor by a union general contractor and all employees were required to be union employees. Yet none of the Plaintiffs belonged to the union. As a subcontractor on public works projects, Enrique Jaime was required to submit certified payrolls to the contractors, to show the number of hours worked by employees. Enrique Jaime personally created the certified payroll reports, creating social security numbers for Plaintiffs when necessary and approximating their hours at each jobsite. These certified payroll statements, though admittedly inaccurate in several respects, constitute the only records of Plaintiffs' work at Laredo. The records reflect fake social security numbers and addresses, inflated wage rates, and undervalued hours reports. But they do constitute a clear approximation of the number of days worked by each Plaintiff. Using the number of days included on the certified payroll records, therefore, the Court can reasonably approximate Plaintiffs' minimum wage and overtime damages by multiplying the number of days by 11 hours (the average workday). In this regard, the Court simply applies the parties' agreed upon minimum wage rates for the first 40 hours worked each week and 1.5 times those rates for any hours worked over 40. Such damages

14

are readily discernible, and Plaintiffs' Group Exhibits 5, 6, 7, 8, and 9, admitted at trial without objection, demonstrate a fair and accurate estimate of Plaintiffs' damages under the Illinois Minimum Wage Law and the Fair Labor Standards Act.

The calculation of damages under the Prevailing Wage Act requires one additional step: the determination of the applicable prevailing wage rate. Whereas there is a single applicable minimum wage rate, the prevailing wage rate is set by the Department of Labor and depends upon a number of factors, including the county and the month in which the work is performed. Although the parties generally agree on what rates applied during the relevant time period, they have not agreed on the specific rates to be applied to specific jobs or hours; nor have they offered a stipulation concerning the county-by-county locations of the jobs Plaintiffs worked. Plaintiffs' Group Exhibits 5, 6, 7, 8, and 9 reflect Plaintiffs' best estimate concerning the applicable prevailing wage rates and their prevailing wage damages.

### B. Plaintiffs' FLSA & IMWL Claims

Enrique Jaime is an "employer" within the meaning of the Fair Labor Standards Act, the Minimum Wage Law, and the Prevailing Wage Act. Factual Stipulations 13–15; [266] at 6, ¶¶ 16–18. Additionally, Plaintiffs are "employees" within the meaning of the Fair Labor Standards Act, the Minimum Wage Law, and the Prevailing Wage Act. Factual Stipulations 10–12; [266] at 6, ¶¶ 13–15. The decisions entered in this case to date establish that all operations of Enrique Jaime's landscaping business were conducted by him as a sole proprietorship doing business

15

as "Laredo Systems."[7]  Thus, consistent with Judge Shadur's prior ruling, [196], Enrique Jaime personally remains fully responsible for Plaintiffs' damages.

Under the Fair Labor Standards Act, an employer must pay its employee overtime wages (150% of the employee's hourly wage) for each hour worked in excess of forty hours a week. 29 U.S.C. § 207(a)(1);  *Hicks v. Avery Drei, LLC*, 654 F.3d 739, 745 (7th Cir. 2011).  The Illinois Minimum Wage Law provides the same overtime wage protections to hourly workers as the FLSA.  *See* 820 ILCS § 105/4a. As a result of their common purpose and similar language, the two statutes generally require the same analysis.  *See Driver v. AppleIllinois, LLC*, 917 F.Supp.2d 793, 798 (N.D. Ill. 2013) (citing *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3, 605 (7th Cir. 1993)).

To prevail on their FLSA and IMWL claims, Plaintiffs must prove that: (1) they worked overtime without compensation; and (2) Enrique Jaime knew or should have known of the overtime work.  *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176–77 (7th Cir. 2011); 29 C.F.R. § 785.11.

As to the latter, Plaintiffs have met their burden.  The evidence shows that Jaime met Plaintiffs at the shop each morning to assign jobs, prepared Laredo's certified payroll records, and cut Plaintiffs' paychecks.  The parties stipulated that Jaime recorded six hours per employee per workday because he "only counted the time an employee had a shovel in his hand as work time."  Factual Stipulation 63; [266] at 9, ¶ 66.  But the time Plaintiffs spent receiving instructions, gathering their

---

[7] The parties also stipulated that from 2005 to the present, Enrique Jaime was the sole owner of the sole proprietorship Laredo Systems. *See* [275] at 41–42 (factual stipulation 98 published and admitted); [266] at 5, ¶ 4.

required tools, and traveling to the job site was also compensable, as was the time Plaintiffs spent traveling back to the shop after work; indeed, the parties stipulated to this fact as well. Factual Stipulation 97; [266] at 11, ¶¶ 100, 101. Jaime testified at trial that he required Plaintiffs to come to the shop first and then leave for their worksites by 7:00 a.m. [275] at 130–32. He also testified that the work crews usually got back to the shop around 5:30 p.m. *Id.* at 134. This evidence and testimony shows that Jaime knew Plaintiffs were logging 10.5 to 11 hours each day. Additionally, the parties stipulated that Enrique Jaime was aware that the law required him to pay his employees a minimum wage and overtime for hours worked in excess of 40 in a workweek. Factual Stipulations 45, 46; [266] at 8, ¶¶ 48, 49.

Plaintiffs have also proved that they worked overtime without compensation. To be sure, an employee bears the burden of proving that he performed overtime work for which he was not properly compensated, *e.g., Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), superseded by statute on other grounds as stated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005); *Brown v. Fam. Dollar Stores of IN, LP*, 534 F.3d 593, 594 (7th Cir. 2008). But Laredo's compliance with the FLSA's standards for keeping accurate records determines the burden of proof Plaintiffs must bear in establishing the number of overtime hours they worked. *Blakes v. Illinois Bell Tel. Co.*, 75 F. Supp. 3d 792, 806–07 (N.D. Ill. 2014) (citing 29 U.S.C. § 211(c); *Brennan v. Qwest Commc'ns Int'l, Inc.*, 727 F. Supp. 2d 751, 762 (D. Minn. 2010)).

The FLSA requires covered employers to "make, keep, and preserve such records of the persons employed by [it] and of the wages, hours, and other conditions

17

and practices of employment maintained by him[.]" 29 U.S.C. § 211(c). If Laredo's records are inadequate under the above standard and their inaccuracy makes it difficult for the named plaintiffs to prove damages, the named plaintiffs can meet their burden by showing the amount and extent of the unpaid work they performed "as a matter of just and reasonable inference." *Blakes*, 75 F. Supp. 3d at 807 (quoting *Anderson*, 328 U.S. at 687; *Brown*, 534 F.3d at 595). The burden then shifts to Defendants to produce either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Id.* (citing *Anderson*, 328 U.S. at 687–88). If, on the other hand, Laredo's records are adequate under the FLSA's standards, then the accurate time records will establish the amount of damages and the general rule precluding recovery of uncertain or speculative damages applies. *Id.* (citing *Schremp v. Langlade Cnty.*, No. 11 CV 591, 2012 WL 3113177, at *3 (E.D. Wis. July 31, 2012); *Brown*, 534 F.3d at 595.

Based upon the evidence and testimony at trial, the Court finds that Laredo's records fall short of compliance and are, in relevant ways, inaccurate and unreliable. For example, they contain false social security numbers, addresses, and union affiliations, inflated wages, and under-reported hours. Enrique Jaime admits that he created them based upon estimates and guesses of time spent on the job sites, and that they do not reflect travel time or time spent loading and unloading equipment at the beginning and end of a shift. As a factual matter, therefore, this Court finds that the record triggers *Anderson*'s "just and reasonable inference" standard.

18

Even though the certified payroll records lack certain indicia of trustworthiness on a variety of issues, the parties all agree that they accurately reflect the number of days each Plaintiff worked; everyone also agrees that the paychecks admitted into evidence accurately reflect the amount of money paid to each employee based upon the agreed-upon daily rate, multiplied by the number of days each employee actually worked that week. Using simple division, therefore, the paychecks accurately demonstrate the number of days each employee worked in a given week, corroborating the certified payroll records.

Such evidence, coupled with the trial testimony and stipulations demonstrating that employees were required to arrive at the shop by 6:30 a.m., traveled an hour or two to the jobsite, worked approximately six hours at the jobsite, left the jobsite around 4:30 p.m. to return to the shop, and that they generally worked five or six days a week, allows the Court, using the paystubs and time records (admitted at trial without objection), to determine a fair and accurate approximation of the hours omitted from the time records and the unpaid compensation. In short, Plaintiffs have demonstrated the amount and extent of the unpaid work they performed "as a matter of just and reasonable inference," thus demonstrating their entitlement to damages on their FLSA and IMWL claims.

Before turning to the specific damage amounts, the Court first observes that damages are appropriate for work performed in the three years leading up to the filing of the complaint, from March 5, 2007, through March 5, 2010. Based upon the evidence, this Court finds that Laredo's failure to pay was willful, and the three-year

statute of limitations thus applies. *E.g., Howard v. City of Springfield, Illinois*, 274 F.3d 1141, 1144 (7th Cir. 2001) (the statute of limitations for FLSA violations is two years unless the violation was willful, in which case the limitations period is three years); *House v. Illinois Bell Tel. Co.*, No. 15 C 2718, 2016 WL 757980, at \*2 (N.D. Ill. Feb. 26, 2016) (the IMWL carries a three-year statute of limitations for private actions); 820 ILCS 105/12(a) (effective 7/14/06 to 2/18/19).

Additionally, because Defendant Jaime raised the issue in his testimony, the Court notes that, to the extent any Plaintiff agreed to work for less than the minimum wage, such agreements are void. *E.g., Jewell Ridge Coal Corp. v. Loc. No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167 (1945) ("The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."); *Lewis v. Giordano's Enters., Inc.*, 921 N.E.2d 740, 745 (Ill. Ct. App. 2009) ("an agreement by an employee to accept less than minimum wage is void as a matter of law").

In calculating minimum wage damages, the Court applies the stipulated minimum wage rates: $7.50 per hour from the beginning of the statute of limitations period (March 5, 2007) through June 30, 2008; $7.75 per hour from July 1, 2008

through June 30, 2009; and $8.00 per hour from July 1, 2009 through the filing of the complaint (March 5, 2010). *See* Factual Stipulations 93–95; [266] at 11, ¶¶ 97–99.

Multiplying the number of days worked by 11 provides a reasonable estimate of the number of hours worked each week, which in turn allows the Court (applying the stipulated minimum wage rates) to calculate what Plaintiffs should have been paid. Based upon the factual record, the Court then (1) compares what Plaintiffs should have been paid with what the paychecks show they were paid; and (2) calculates damages for unpaid overtime. In so doing, the Court reasonably infers that each workday constituted an 11-hour shift.

With regard to the number of hours worked each day and each week, the testimony was consistent: Plaintiff Jaime Mercado testified that he arrived at the shop each day by 6:00 a.m. and returned to the shop at 6:00 or 7:00 p.m., except on Saturdays, when he worked just until 4:00 .m. [274] at 17, 19. Bernardo Mercado testified that he worked between 11 and 12 hours a day five or six days a week. *Id.* at 51–52, 54, 57. Celestino Mercado testified that he worked five to six days a week, arriving at 6:00 a.m. and leaving for the day between 6:00 and 7:00 p.m. [274] at 72–73, 75. And Defendant Enrique Jaime testified that he required Plaintiffs to leave the shop by 7:00 a.m. for their jobsites, and that they usually returned to the shop about 5:30 p.m.. [275] at 130–32, 134. Additionally, Plaintiffs and Defendant Jaime testified that Plaintiffs' paychecks accurately reflect the amount of money they received each week, and that dividing the amount paid by the employee's flat rate would yield the number of days worked for each employee. To calculate the actual

damages owed each Plaintiff, the Court credits the Plaintiffs' paychecks to determine the number of days worked during each pay period, and then applies the relevant rate (either the minimum wage rate or the overtime rate) based upon an 11-hour workday.

Similarly, knowing the number of hours worked and the amount paid, the Court can and does calculate any minimum wage deficiencies. The unpaid minimum wages are easily calculated using the payroll records and paychecks in evidence. By paying a flat rate of $80 per day for each 11-hour day, Enrique Jaime paid Plaintiffs Jose Guzman, Bernardo Mercado, Celestino Mercado, and Crisanto Pichardo, just $7.28 per hour, which is less than the minimum wage.[8] As a result, this Court finds that these Plaintiffs may recover the amount of any such underpayments, together with costs and such reasonable attorney's fees, as well as damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid, 820 ILCS 105/12.

Take for example Bernardo Mercado, who worked for Laredo for just one season, the 2008 season. Group Exhibit 2, admitted without objection, includes all of the paychecks Laredo issued to Bernardo Mercado. The first check, issued on March 21, 2008, shows that Laredo paid Mercado $320.00. Group Exhibit 2 at Bates No. 0837. Because the evidence shows that Laredo paid Mercado a flat rate of $80 per day, the record allows the Court to reasonably infer that Mercado worked four days that week. Consistent with Judge Manning's findings and the evidence at trial, the

---

[8] Jaime Mercado's daily rate of $120 exceeds the minimum wage rates for the applicable years. As discussed below, however, this Plaintiff remains entitled to overtime wages under the FLSA.

Court also reasonably infers that Mercado worked 11 hours in each of those four days, for a total of 44 hours. Thus, Laredo paid Mercado $7.27 per hour for all 44 hours, when it should have paid him $7.50 per hour for all regular hours, and $11.25 per hour for all overtime hours. As demonstrated on Group Exhibit 7, also admitted without objection, Mercado's unpaid minimum wage was $10.00 (at $7.50, he would have earned $330.00, but instead earned $320.00), and his unpaid overtime is $45.00 ($11.25 per hour for the four hours he worked in excess of 40). Using the paychecks in Group Exhibit 2, the Court thus finds, as demonstrated on Plaintiffs' Group Exhibit 7, that Mercado's total unpaid minimum wage damages are $530.87, and his total unpaid overtime damages are $4,205.82. *See* Plaintiffs' Group Ex. 7 at line 40, col. J, M.

Using the paychecks in this manner to determine unpaid minimum wages and overtime damages, the Court makes the following findings of fact:

- Plaintiff Jose Guzman's total unpaid minimum wage damages are $1,845.12, and his total unpaid overtime damages are $12,523.21, *see* Group Ex. 1; Plaintiffs' Group Ex. 5, line 99, col. J, M;

- Plaintiff Celestino Mercado's total unpaid minimum wage damages are $1,524.36, and his total unpaid overtime damages are $9,199.54. *See* Group Ex. 3; Plaintiffs' Group Ex. 8, line 72, col. J, M; and

- Plaintiff Crisanto Pichardo's total unpaid minimum wage damages are $1,537.50, and his total unpaid overtime damages are $8,413.18. *See* Group Ex. 5; Plaintiffs' Group Ex. 9, line 119, col. J, M.

Finally, the Court finds that Plaintiff Jaime Mercado, whose flat daily rate satisfies minimum wage concerns, has incurred no minimum wage damages. Having worked significant overtime hours without overtime compensation, however, he has

incurred total unpaid overtime damages of $39,115.41. *See* Group Ex. 4; Plaintiffs' Group Ex. 6, line 196, col. J.

In addition to minimum wage and unpaid overtime damages, Plaintiffs, having prevailed on their FLSA and IMWL claims, are also entitled to an award of reasonable attorney's fees and costs associated with the litigation. *See* 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."); *Spegon v. Catholic Bishop of Chic.*, 175 F.3d 544, 550 (7th Cir. 1999) ("The FLSA directs courts to award reasonable attorneys' fees and costs to prevailing plaintiffs."); 820 ILCS § 105/12 ("If any employee is paid by his employer less than the wage to which he is entitled under the provisions of this Act, the employee may recover in a civil action the amount of any such underpayments together with costs and such reasonable attorney's fees as may be allowed by the Court . . . ."). The Court will award such fees and costs in a separate order.

### C. Plaintiffs' Prevailing Wage Act Claim

Illinois' Prevailing Wage Act requires that all persons "employed by or on behalf of any public body" be paid not less than "the general prevailing rate of hourly wages for work of a similar character on public works in the locality in which the work is performed." 820 Ill. Comp. Stat. 130/3. Judge Manning previously ruled that "the undisputed facts establish that the defendants failed to pay the prevailing wage for the days that the plaintiffs worked on prevailing wage projects, and thus the motion for summary judgment on the issue of liability is granted." [111] at 8.

24

As for damages, the evidence provides a factual basis for awarding damages generally under the Prevailing Wage Act, as it established that the bulk of Plaintiffs' hours were performed on such jobs. The evidence showed that Plaintiffs' work fell into three buckets: prevailing wage act work, other public project work (typically state jobs or work for the Illinois Department of Transportation), and work on Defendant Jaime's farm. The parties stipulated that only 5% of Laredo's work was for the Illinois Department of Transportation, Factual Stipulation 7, and Defendant Jaime testified that most of Laredo's work constituted prevailing wage jobs. [275] at 57. Plaintiffs similarly testified that they mostly worked on the highways and freeways. *See* [274] at 21 (where Jaime Mercado testified that he worked on state highways); *id.* at 55 (where Bernardo Mercado testified that, when he was not working at Enrique Jaime's farm, he worked on the highways, 90 to 90/94, 355, and 88, in Cook and Lake counties); *id.* at 77 (where Celestino Mercado testified that, other than the few days per season he worked on the farm, he worked "on the freeways"). All of this evidence supports a finding that Plaintiffs performed an unspecified amount of landscaping work on projects falling under the auspices of the Prevailing Wage Act.

Notably, however, in contrast to their stipulations concerning the minimum wage rates, the parties did not stipulate to the applicable prevailing wage rates; and the record otherwise failed to establish those rates as applied to work performed. No witness credibly testified to the applicable prevailing wage rates. In fact, Bernardo Mercado testified that the prevailing wage rate in 2008 was $7.50, *id.* at 67, but his guess falls far short of the purported rates reflected in Plaintiffs' own proposed

damages. The parties did offer Joint Exhibit 6, which lists stipulated prevailing wage rates for "Group A" and "Group B" counties for the months of January and July in 2005, January and July in 2007, July of 2008, and July of 2009. But these rates vary, and at trial, Plaintiff failed to tie any specific rate to any particular project or work. And no witness explained how or why such rates were selected (from numerous others) for inclusion on the exhibit, which counsel prepared for the litigation.

The Court could take judicial notice that the Illinois Department of Labor publishes prevailing wage rates each year at https://www2.illinois.gov/idol/Laws-Rules/CONMED/rates/06-01Jan/county.htm (listing the prevailing wage rates for each Illinois county, delineated by trade).[9] But the parties did not invoke judicial notice at trial, and the published rates, without more, do not allow this Court to reasonably calculate the proper amount of this type of damages. For example, the IDOL resources demonstrate that the prevailing wage rates differ, even within the same year, depending upon: (1) the month in which the work is performed; (2) the county in which the work is performed; and (3) the category of tradesman performing the work. *Id.* Although Joint Exhibit 6 includes some stipulated rates, it does not show what work was performed in what county in what month, and does not otherwise provide a basis for reasonable, evidenced-based approximations of such facts.

---

[9] *See Patel v. Hurd*, No. 12 C 556, 2012 WL 1952845, at *4 (N.D. Ill. May 30, 2012) (court may take judicial notice of facts drawn from public records available on a government website under Federal Rule of Evidence 201(b) because "a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned."); *Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n. 2 (S.D. Ill. 2006) (a court may judicially notice public records available on government websites).

Consistent with the IDOL's resources, the parties acknowledged, in their arguments to the Court, that the applicable prevailing wage rates depend upon the county within which the work was performed. And, to this point, Plaintiffs' counsel argued that the vast majority of Laredo's work was probably performed in Zone A, with some work being done in Zone C. *See* [275] at 92. But the prevailing wage information available on the IDOL website speaks in terms of counties, not zones.

Moreover, neither the trial testimony nor the admitted exhibits provide a factual basis to determine what work was done in what counties (or zones, or groups). Jaime Mercado testified that he worked on state highways including 90, 94, 355, 88, and that he worked "in the counties that are in the area or near the area of Chicago." [274] at 21. He testified that he worked in Lake, Cook, and Will counties and possibly others, and sometimes worked on the west side of the state. *Id.* at 22. But he could not say —and the record otherwise fails to provide an evidentiary basis to determine—which hours, performed in which month, were performed in which county. Likewise, Bernardo Mercado testified that he worked on the highways, 90 to 90/94, 355, and 88, in Cook and Lake counties, *id.* at 55, but, again, he offered no testimony to show (or even reasonably approximate) which hours were performed in which county. So too Celestino Mercado, who testified that he worked mostly on 90/94 and 355, and "possibly other" freeways that he could not recall, in the counties "close to Chicago" the names of which he did not know. *Id.* at 77. Importantly, all of the highways mentioned by Plaintiffs span multiple counties and several (including I-90 and I-94) span multiple states. As a result, Plaintiffs' testimony does not really

27

narrow the universe of potentially applicable prevailing wage rates. To the extent some Plaintiffs were able to identify specific counties, they offered no basis for how the Court should apportion their hours amongst those various counties; nor were they even able to offer an exhaustive list of the counties in which they worked. In short, Plaintiffs' testimony and evidence does not provide a basis to apply any specific prevailing wage rate over another.[10]

At trial, Plaintiff's counsel admitted that, based upon the evidence, he "had no idea how to be able to calculate" the percentage of prevailing wage work that occurred in each county. [275] at 91. Although Plaintiffs admitted Plaintiffs' Group Exhibits 5, 6, 7, 8, and 9 in an effort to support Plaintiffs' prevailing wage damages, they did not present a witness to fully explain how those spreadsheets were created, or what underlying data was used, *etc.*, to create them. Clearly, Plaintiffs plugged certain rates into the spreadsheets, but they did not support their decision to select particular rates over others. The Court specifically highlighted such evidentiary deficiencies in Plaintiffs' proof of prevailing wage damages and pressed for any factual basis for the calculation of these damages:

> THE COURT: If there are different zones – A, B, and C – and there's a total number of hours, how do I break the hours into the zones to come up with a number that has – without just grabbing numbers out of the air . . . because the rates are different. Otherwise, I can't do the calculation. . . . How do I break the X, which is the total number of hours worked, into Zones A, B, and C? I can't just guess. I would have to have something to point to in the record because you have the burden of proof.

---

[10] In fact, although the parties' admitted a stipulation of certain Illinois prevailing wage rates, the record does not even establish that the jobs at issue fell within the Illinois Prevailing Wage Act, as opposed to the Davis-Bacon Act, which covers federal construction projects and may supply different wage rates, for which the parties offered no stipulation. *See* [275] at 66 (where Enrique Jaime implied that some of Laredo's work constituted "federal" jobs).

> I would have to have something to point to that, Judge, it's 50 percent A, it's 20 percent B, and 30 percent C, or something. I mean, I – there has to be some way to break it out. Otherwise, how have you proven any – because that's a critical variable in the algorithm, right?

[275] at 92–94. In response, Plaintiffs' counsel represented that the "certified payrolls indicate where the project is located on it. It will say where the job was or the project name. Then that's the location of the job. All of those locations are in Zone A with the exception of those set forth in red, which are in Zone C." *Id.* at 96. But counsel admitted that the certified payroll records do not themselves delineate which hours were worked in "Zone A" or "Zone C." *Id.* at 96. Again, the parties offered no stipulation on this issue. In fact, defense counsel disputed that the records, by themselves, established the applicable rates, as the following exchange makes clear:

> Mr. O'Neil [defense counsel]: Certifications will say – I'll just read it as an example – well, not all of them do actually –"Spring Road. Federal contractor, Walsh. Week ending, February 9th, 2008." That's what's in evidence, Judge.
>
> THE COURT: Well, also what's in evidence is the chart and it's the charts, Plaintiff's Group 5, 6, 7, 8, and 9, which went in without objection. So he's going to – plaintiff's counsel, correct me if I'm wrong. He's going to argue that the chart, which is in evidence, is based at least in terms of divvying up X as to A and C is derived from the certifications which, in whole or in part, are listing locations which would give you counties which would in turn help you determine which hours are in Zone A or Zone C, right?
>
> MR. HARRISON [Plaintiffs' counsel]: That's exactly correct, Judge.
>
> THE COURT: Okay. Is there any other factual basis other than what I just mentioned for [separating] X into Zone A and C?
>
> MR. HARRISON: Just the plaintiff's testimony –
>
> THE COURT: Well, the plaintiff's testimony didn't – wasn't county-specific.
>
> MR. HARRISON: Well, they did, they did testify they worked in Cook, Will, DuPage, and Winnebago.
>
> THE COURT: They gave you the group but they didn't give you any type of estimate of which number of hours would be in which.
>
> MR. HARRISON: No. That's correct, Judge.

> THE COURT: Okay. So [what are] your thought on that?
> MR. O'NEIL: My whole thought on this, Judge, is from the beginning –
> and I understand quite well that if timecards or other things had been
> available, we could have been able to discern this. But now relying on
> the certified payrolls, which Mr. Harrison is criticizing is unreliable, if
> that's the basis for these charts, there's no way you can establish where
> they came from, what the allotment was.

[275] at 96–98. The Court agrees—Plaintiffs' plucked one rate from many, without an evidentiary basis for doing so. [11]

Moreover, Plaintiff's failure of proof cannot simply be chalked up to Laredo's shoddy recordkeeping practices. If, as the record suggests, the relevant projects constituted public works projects, documents ought to exist concerning the jobs' precise location and applicable rates. Indeed, Enrique Jaime testified that Laredo received work through a bidding process for such jobs, and records of those contracts undoubtedly exist. Even if Laredo did not retain records of the awarded contracts, the general contractors or the State ostensibly would have done so.

Beyond the public contracts (and the requisite underlying records), additional public documents could have tied the job sites identified on the certified payroll records to a particular county, and, to the extent they still exist, those documents could have been introduced or referenced at trial. *E.g., Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (court may take judicial notice of documents within

---

[11] Plaintiffs' counsel proposed using the prevailing wage rate for Jo Daviess County to calculate all prevailing wage damages, as that rate (according to counsel) is lower than the other counties' rates. *See* [275] at 87. But the decision to apply this rate remains wholly untethered to the evidence. No witness testified that Laredo even sent workers to Jo Daviess County. Instead, the evidence *did* show that time captured on Plaintiffs' spreadsheets represents work performed in numerous counties in various months throughout each season. Such evidence precludes the application of *any* single rate, let alone the proposed "Jo Daviess" rate. Establishing a theoretical floor to the amount of these damages fails to establish a reasonable approximation of the correct amount itself.

the public realm). But it is Plaintiffs' burden to identify and present such documents; it is not this Court's job to track down such evidence. *See, e.g., In re Sorci*, 315 B.R. 723, 728 (Bankr. N.D. Ill. 2004) ("it is not the responsibility of the Court to behave 'like pigs, hunting for truffles buried in briefs.' While the court may, in its discretion, take judicial notice of matters of public record, it is not the responsibility of the court to scour the record to make a party's case for it.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) and citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)).

Plaintiffs also could have called the person who prepared their spreadsheets to explain the underlying evidence used to ascertain the prevailing wage rate for each set of hours; that person may have, for example, testified that he or she took the name of the project from the payroll records and then used other sources to determine where the project occurred. But Plaintiffs did not call such a witness or otherwise present such evidence. At trial, Plaintiffs' counsel represented that all of the jobs identified on the certified payroll records were in "Zone A," with the exception of a small undefined subset, which were located in "Zone C." [275] at 96. He also represented that none of the jobs were in "Zone B." *Id.* at 92. But this conclusory proffer requires something more than an unexplained review of the certified payroll records, which identify jobs in a general or even nondescript manner. *See* Group Exhibits 8–17 (identifying projects such as "Valley Bridge" or "Spring Rd." or "Finley 83" or "West Lake Ave" or "North of Plaza 21" or "South of Plaza 21" or "Sheridan Road" or "Howard Street" or "Salt Creek"). The record lacks the additional evidence necessary

to link the generic job names to a specific county within the State of Illinois, and Plaintiffs failed to build a bridge between the exhibits and their conclusions.

Given the deficiencies in Plaintiffs' proof, the record supplies no basis to determine what rates to apply in awarding damages on Count III. As a result, any award of prevailing wage damages would necessarily—and improperly—rest upon guesswork and speculation. *E.g., Wasson v. Peabody Coal Co.,* 542 F.3d 1172, 1176 (7th Cir. 2008) (affirming the entry of judgment as a matter of law where the damages award was unsupported in the evidence and based on nothing but speculation and guesses); *Brand v. Comcast Corp.,* 135 F. Supp. 3d 713, 742 (N.D. Ill. 2015) (noting that, even under *Anderson*'s relaxed standard, plaintiffs must still submit sufficient evidence from which a jury could calculate their damages; plaintiffs "may rely on their recollection, but not on speculation."). Unwilling to guess or divine numbers from thin air, the Court declines to award Plaintiffs damages under the Prevailing Wage Act based upon the evidence adduced in the record.

## IV. <u>Conclusion</u>

For the reasons explained more fully above, based upon the prior decisions constituting the law of the case, and based upon the evidence at trial, the Court finds in favor of Plaintiffs and against Defendants on Plaintiffs' FLSA claim (Count I), IMWL claim (Count II), and IPWA claim (Count III), and awards damages as follows: to Plaintiff Jaime Mercado, $39,115.41 (all on Count I); to Plaintiff Bernardo Mercado, $4,736.69 ($4,205.82 on Count I and $530.87 on Count II); to Plaintiff Celestino Mercado, $10,723.90 ($9,199.54 on Count I and $1,524.36 on Count II); to

Plaintiff Jose Guzman, $14,368.33 ($12,523.21 on Count I and $1,845.12 on Count II); and to Plaintiff Crisanto Pichardo, $9,950.68 ($8,413.18 on Count I and $1,537.50 on Count II), for a total award of $73,457.16 on Count I and $5,437.85 on Count II.

Plaintiffs having failed to present sufficient evidence to support the calculation of prevailing wage damages, the Court declines to award damages on Count III.

Because Plaintiffs prevailed on their FLSA and IMWL claims, however, the Court awards, in addition to damages as set forth above, reasonable attorney's fees and costs of suit. *See* 29 U.S.C. § 216(b); 820 ILCS § 105/12.

The Court directs the Clerk to enter judgment accordingly and will issue a separate order awarding attorneys' fees and costs.

Dated: March 31, 2022                    ENTERED:

                                         Judge John Robert Blakey
                                         United States District Court